IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TARA LETRICE NEWTON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 12-CV-462-PJC** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration,[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Tara Letrice Newton ("Newton"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her application for supplemental security income benefits under the

Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3),

the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of

this order will be directly to the Tenth Circuit Court of Appeals.  Newton appeals the decision of

the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ

incorrectly determined that she was not disabled.  For the reasons discussed below, the Court

**AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting
Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as
Defendant in this action.  No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Newton was 39 years old at the time of the hearing before the ALJ on April 6, 2011.  (R. 55, 60).  She testified that after dropping out of high school she earned her GED.  (R. 50).  She reported that she was 5'4" and she weighed 185 pounds.  (R. 51).  Newton's work history included jobs as a security guard, a cashier, a fast food worker, and a watch assembly line operator.  (R. 36-40, 53-54).  Newton's application was based on diabetes mellitus, hypertension, polycystic ovary disease, vertigo, and depression.  (R. 34-35, 43).

Newton quit her last job because of problems with her blood sugar level and high blood pressure being out of control.  (R. 41).  She was later diagnosed with diabetes, and she started medications for diabetes and high blood pressure.  (R. 41-42).  The medications needed to be adjusted several times due to their side effects.  (R. 42).  It took approximately six months to get her diabetes under control and for her medication side effects to improve.  *Id.*  At the date of the hearing, her side effects included dizziness and flatulence.  *Id.*

Newton testified that she was first treated for symptoms of intermittent tinnitus and vertigo at the emergency room in 2009.  (R. 46).  The emergency room doctor told her that she needed to be seen by her primary care physician.  (R. 46-47).  When she was seen for a follow up appointment with her doctor, she was given medication and instructed how to do exercises to help her symptoms.  (R. 48).  Her symptoms continued to occur daily when she sat up.  (R. 48-49).  She had a loud ringing in her ears that made her feel like everything was spinning.  (R. 49).  These episodes made her feel dizzy, weak, and nauseated.  *Id.*  When this happened, it was hard for her to get out of bed right away, so she had to lie back down, and she generally fell asleep for a few hours.  *Id.*

Newton testified that she had pain in her left arm that made it hard for her to lift a plate. (R. 45-46).  She was right-handed and tried to do everything with that hand.  *Id.*  She said that her primary care doctor had referred her to a physical therapist.  (R. 45, 51-52).  After about two months of therapy, the physical therapist referred her back to her doctor with the recommendation that she be referred to a neurologist for possible neuropathy.  *Id.*

Newton testified to difficulty sleeping.  (R. 43-44).  She was in bed by 10 p.m., but was awakened a few hours later and was unable to return to sleep until about 4:00 a.m.  (R. 44).  The lack of sleep caused Newton to have headaches and to feel tired all the time.  (R. 43-44).

During the hearing, Newton provided a daily diary that detailed her activities of daily living from June 21, 2010 through July 8, 2010.  (R. 43, 192-98).  In reviewing the diary, Newton outlined symptoms of feeling dizzy, tired, weak, nauseated, and faint.  (R. 192-98).  She had headaches and felt pressure behind her eyes.  *Id.*  She experienced problems with incontinence.  (R. 192, 194-95).  She wrote that she had difficulty functioning due to problems with insomnia and fatigue.  (R. 195).  She suffered crying spells and depression.  (R. 192, 194-95).  Newton wrote that she did not like to talk about her depression because she felt embarrassed and because she did not want others to know that she was "suffering."  (R. 195).  The diary indicated that she had problems with concentration, memory, and task completion.  (R. 192, 195).  She would forget which medications she had taken.  (R. 197).  Newton's children helped remind her of things, and she tried to write herself notes, but she still sometimes forgot.  (R. 195).  Newton indicated that she was able to take care of her personal needs independently, take her medications, monitor her blood sugars, and cook.  (R. 193-98).  In her testimony, she said that after she got up in the morning, she made sure her that her daughter got up and got ready for school.  (R. 44).

3

Regarding her physical limitations, Newton testified that her children did the housework and that she helped them when she could. *Id.* Newton said that she cooked the meals, but was unable to do it by herself due to problems with her left arm. (R. 45). The most complicated meal Newton cooked with the help of her daughter was spaghetti. *Id.* In her diary, she said that she was unable to sit and to stand for long periods. (R. 195). Her ankles and her feet became swollen and sore. *Id.* She told the ALJ that she would go back to work if she was able to, because she was taught that a job was needed to survive. (R. 50).

Records show that Newton was treated at the OU Physicians Clinic from November 2007 through 2010. (R. 205-99, 333-48). On November 7, 2007, Newton was evaluated by Sandra Hutchinson, M.D. (R. 289-94). Newton's prior relevant medical history included type II diabetes, controlled without complication; hypertension; hyperlipidemia, mixed; exogenous obesity; and rule out glaucoma, not otherwise specified. (R. 290-91). Dr. Hutchinson's impressions were type II diabetes, well controlled, without complications; and hyperlipidemia, mixed. (R. 293). At Newton's appointment with Dr. Hutchinson on February 6, 2008, her diabetes remained controlled without complication. (R. 279-83).

On May 16, 2008, Newton presented to Dr. Hutchinson for problems with anxiety and depression. (R. 271-75). Dr. Hutchinson noted that Newton appeared anxious. (R. 274). She diagnosed Newton with anxiety and depression and started her on an anti-depressant medication. (R. 275). At Newton's appointment with Dr. Hutchinson on September 15, 2008, she reported that she was exercising with videos or walking up to two miles three times a week. (R. 263). Her diabetes remained controlled, without complication. (R. 267). On October 21, 2008, Newton presented to Dr. Hutchinson for increased symptoms of depression and anxiety. (R. 253-

4

57).  Newton's affect was depressed and anxious, and Dr. Hutchinson increased the dosage of her anti-depressant medication.  (R. 256).

On October 28, 2008, Newton presented to Christy Beartrack, O.D., for a diagnostic diabetes vision examination.  (R. 299).  Newton's corrected visual acuity was 20/20 bilaterally. *Id.*  The examination showed no complications due to diabetic retinopathy.  *Id.*

Newton presented to Dr. Hutchinson with complaints of difficulty sleeping, irritability, and crying spells on February 3, 2009.  (R. 246).  Newton reported that she had stopped taking her anti-depressant medication because she had been doing well.  (R. 245).  Dr. Hutchinson noted that Newton appeared depressed and anxious.  (R. 249).  Newton was taken off Prozac and was started on Effexor.  *Id.*  At her follow-up appointment on February 18, 2009, Newton's symptoms of anxiety and depression had improved.  (R. 235-39).

At Newton's appointment with Dr. Hutchinson on May 4, 2009, her recorded weight was 196 pounds, her blood pressure was 112/70, and her pulse was 80.  (R. 228).  Newton reported that her blood sugar levels ranged from 116 to 120 daily.  (R. 229).  She had no symptoms of hypoglycemia.  (R. 230).  Dr. Hutchinson's impressions were diabetes, controlled and without complication, hyperlipidemia, and hypertension, benign essential.  (R. 233).

On May 13, 2009, Newton presented to the emergency room at Oklahoma State University Medical Center with complaints of a four-day onset of intermittent bilateral tinnitus, dizziness, and pressure behind her eyes.  (R. 351-66).  She reported that she had experienced sudden episodes of dizziness before, but that the dizziness usually went away.  (R. 355).  She reported that her diabetes and high blood pressure had been well controlled.  *Id.*  Newton's physical examination showed that her blood pressure was 103/67, her pulse was 95, and her blood sugar level was 136.  (R. 356, 358).  The doctor noted that Newton did not appear acutely

5

vertiginous.  (R. 355).  Newton's visual acuity, tilt examination, electrocardiogram, and neurologic examination showed normal results.  (R. 356, 358).  The doctor's impression was vertigo, none found on exam.  *Id.*  The doctor's discharge instructions were for Newton to have a follow-up evaluation by her doctor and to have a diagnostic MRI.  (R. 356, 358, 365).

On May 15, 2009, Newton saw Dr. Hutchinson, and she reported that she had experienced ringing in her ears and intermittent dizziness for several months.  (R. 220-21).  These episodes made her feel nauseated.  (R. 221).  She denied symptoms of anxiety and depression.  (R. 223).  She was having problems with nightmares that she believed were a side effect to taking Effexor.  (R. 220).  Dr. Hutchinson diagnosed tinnitus, anxiety, and depression, and she decreased the dosage of Effexor and started Newton on Antivert for dizziness.  (R. 221, 224).

At Newton's appointment at OU Physicians on September 3, 2009, she reported that she was attending diabetes education classes, was walking for exercise, and was monitoring her blood sugars daily.  (R. 218-19).  On September 8, 2009, Newton was examined by Patrice Wagner, D.O., at OU Physicians.  (R. 214).  Newton reported that she was doing well and was exercising.  (R. 215).  Her monitored blood sugar levels ranged from 120 to 130 daily.  (R. 214).  She was responding well to Effexor.  (R. 216).  Dr. Wagner's impressions were diabetes mellitus, type II, controlled, without complication; hypertension, benign essential; hyperlipidemia, mixed; anxiety; and depression.  *Id.*  When Newton saw Dr. Wagner on October 12, 2009, her tinnitus had resolved, but she was having vertigo when she bent down.  (R. 208).  Symptoms of her diabetes were controlled.  (R. 209).

At an appointment with Dr. Wagner on November 13, 2009, Newton reported having nightmares, trouble sleeping, and increased depression.  (R. 206).  Newton told Dr. Wagner that

she felt she was sleeping poorly due to her depression. *Id.* Dr. Wagner noted that Newton was alert and oriented, and that her mood, affect, attention span, and concentration were normal. (R. 207). Dr. Wagner continued her previous diagnoses of anxiety and depression. *Id.* She instructed Newton to wean off Effexor and to start Zoloft. *Id.*

During Newton's diabetic check up at OU Family Clinic on February 5, 2010, she reported that she was doing well. (R. 340). Newton reported that she did not eat well, and she wanted to be educated on a diabetic diet. (R. 340-44). She said that had experienced a few episodes of feeling lightheaded and sweaty. (R. 340). She usually would lie down when this happened. *Id.* When she attended diabetes class on February 17, 2010, she again reported that she was doing well. (R. 337-39). Her diagnoses were diabetes, controlled, without complication; and hyperlipidemia, mixed. (R. 339).

Newton received outpatient mental health treatment at DaySpring Community Services ("DaySpring"). (R. 374-406). In Newton's initial assessment dated August 12, 2010, her noted problems were mood lability, depression, and poor coping skills. (R. 376). She reported that she stayed in her home and went for days without any contact. (R. 376-77). Newton experienced crying spells three or four times a day. *Id.* She had problems with memory and impulse control. *Id.* She stated that she had experienced problems with depression all her life and that she had attempted suicide three times. (R. 376, 381). Newton said that she decided to seek counseling instead of continuing in pain. (R. 381). The intake counselor assessed Newton on Axis I[2] with

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

major depressive disorder, recurrent, moderate.  (R. 375).  Newton's Global Assessment of

Functioning ("GAF")[3] was assessed as 50, and 50 was her highest level in the past year.  *Id.*

A second DaySpring assessment was completed on February 16, 2011.  (R. 397-404).

Newton continued to have problems with mood lability, depression, isolation, memory, impulse

control, and crying spells.  (R. 399).  She was sleeping better at night, but was having problems

staying awake during the day.  *Id.*  Her Axis I diagnosis remained major depressive disorder,

recurrent, moderate, but her GAF was 55, and her highest level was 55 in the past year.  (R.

398).

Newton was seen for a psychological evaluation by agency examining consultant Denise

LaGrand, Psy.D., on January 6, 2010.  (R. 300-05).  Newton's reported chief reasons for

disability were anxiety, fatigue, insomnia, low self-esteem, and difficulty completing tasks.  (R.

300).  She told Dr. LaGrand that her ability to work was affected by symptoms of vertigo.  *Id.*

The combination of fluctuating blood sugars and insomnia caused her to feel chronically tired

and fatigued.  *Id.*  Newton described her typical mood was depressed, but she said that her

medication, Zoloft, helped.  (R. 301, 303-04).  She also took medication for vertigo.  (R. 301).

Newton's reported medication side effects included drowsiness, dizziness, nausea, dry mouth,

headaches, and insomnia.  (R. 301).  She reported that these problems made it difficult for her to

---

[3] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

concentrate and to focus on work tasks.  (R. 300).  Newton was distrustful of people, she avoided social relationships, and she did not like to be around people.  (R. 302).  Newton told Dr. LaGrand that a year earlier she had attempted suicide by hanging herself, but that the rope broke. (R. 303).  She did not seek medical attention after this attempt to take her life.  *Id.*  She said that she was trying to make an appointment at Parkside Psychiatric Hospital & Clinic for treatment, but was feeling too sick to go anywhere, and she had transportation difficulties.  (R. 301).  In Newton's description of her typical day, she reported that she could perform her own personal care, cook, and manage her finances.  (R. 304).  She had difficulty controlling her diet.  *Id.*  She experienced dizziness doing household chores, so she tried to rest frequently.  *Id.*  Unless she needed something at the store, she did not shop much.  *Id.*  She lacked the energy and interest to follow through with her hobbies.  *Id.*  She did not know how to balance a checkbook.  *Id.* Newton said that she slept during the day due to insomnia and stayed in her room unless she needed something.  (R. 305).

Dr. LaGrand found Newton's memory skills to be low to below average.   (R. 305). Newton's pace was slow during testing, and she needed encouragement to try tasks that she found difficult.  *Id.*  Newton's judgment was estimated to be adequate.  *Id.*  Newton's test scores showed she had a borderline or low average IQ.  (R. 304).  Based on her examination, Dr. LaGrand found low average abilities and intellectual functioning would limit the type of work that Newton was capable of doing.  (R. 305).  Dr. LaGrand determined that Newton's condition was not likely to improve significantly within twelve months.  *Id.*  Dr. LaGrand's Axis I diagnoses were major depressive disorder, mild, controlled with medication; and generalized anxiety disorder.  (R. 304).  On Axis II, she wrote a note to rule out borderline intellectual functioning.  *Id.*  She assessed Newton's GAF as 65.  *Id.*  Based on Newton's limitations, Dr.

LaGrand believed that she would need assistance in managing her funds.  (R. 305).

Agency non-examining consultant Sharon Taber, PhD., completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on January 27, 2010. (R. 307-24).  In the Psychiatric Review Technique Form, for Listing 12.04 Dr. Taber noted Newton's depressive symptoms and her major depressive disorder, mild, controlled with medication.  (R. 314).  For Listing 12.06, Dr. Taber noted Newton's generalized anxiety disorder.  (R. 316).  For the "Paragraph B Criteria,"[4] Dr. Taber found that Newton had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with one to two episodes of decompensation.  (R. 321).  In the "Consultant's Notes" portion of the form, Dr. Taber briefly summarized Newton's treating history at the OU Family Medicine clinic, Dr. LaGrand's examination report, and Newton's activities of daily living.  (R. 323).

In her Mental Residual Functional Capacity Assessment, Dr. Taber found that Newton was moderately limited in her ability to understand, remember, and carry out detailed instructions.  (R. 307).  Dr. Taber found Newton to be markedly limited in her ability to interact appropriately with the general public.  (R. 307-08).  Dr. Taber wrote that Newton could understand and carry out simple and some complex instructions under routine supervision.  (R. 309).  Newton was able to relate superficially to co-workers and supervisors for work matters,

---

[4] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

but not the general public. *Id.* Dr. Taber wrote that Newton's adaptive functions were intact. *Id.*

On February 24, 2010, agency non-examining consultant Janet G. Rodgers, M.D. completed a Physical Residual Functional Capacity Assessment. (R. 326-32). Dr. Rodgers assessed that Newton could perform work at the medium exertional level. (R. 326). In support of her conclusions, she summarized Newton's medical history. (R. 326-27). For postural limitations, Dr. Rodgers found that Newton would have occasional difficulty balancing. (R. 327). Dr. Rodgers found no other limitations. (R. 327-32).

### Procedural History

Newton filed an application on October 14, 2009 seeking supplemental security income benefits under XVI, 42 U.S.C. §§ 401 *et seq*. (R. 120-122). Newton's application was denied initially and on reconsideration. (R. 70-77). A hearing before ALJ Deborah L. Rose was held on April 6, 2011 in Tulsa, Oklahoma. (R. 29-57). By decision dated June 21, 2011, the ALJ found that Newton was not disabled at any time through the date of the decision. (R. 10-23). On June 20, 2012, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

### Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).   Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[5]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the Agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'"

_____

    [5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

*Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither

reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d

at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

At Step One, the ALJ found that Newton had not engaged in any substantial gainful activity

since the application date of October 14, 2009.  (R. 12).  At Step Two, the ALJ found that Newton

had severe impairments of diabetes mellitus, hypertension, polycystic ovary disease, vertigo, major

depressive disorder, and generalized anxiety disorder.  *Id.*  At Step Three, the ALJ found that

Newton's impairments did not meet a Listing.  (R. 12-14).

The ALJ found that Newton had the RFC to perform work at the medium exertional level,

with limitations of only occasional balancing and of no exposure to hazards such as dangerous

moving machinery or unprotected heights.  (R. 14-15).  Additionally, Newton was able to have

superficial interaction with co-workers and supervisors, but no interaction with the public.  *Id.*

Newton was capable of performing simple and complex tasks, but not highly detailed tasks.  *Id.*

At Step Four, the ALJ found that Newton was able to perform her past relevant work as a security

officer.  (R. 21).  As an alternative finding at Step Five, the ALJ found that there were jobs in

significant numbers in the national economy that Newton could perform, considering her age,

education, work experience, and RFC.  (R. 22-23).  Thus, the ALJ found that Newton was not

disabled since her application date of October 14, 2009.  (R. 23).

### Review

Newton's Opening Brief is unusual in that it identifies no specific issues, but only states

that the ALJ's decision was not supported by substantial evidence.  Plaintiff's Opening Brief,

Dkt. #16.  Newton's briefs simply do not meet the requirements of a claimant in articulating her

arguments before this Court.  These requirements were discussed by the majority in the Tenth

Circuit case of *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).  In *Wall*, the court discussed

an argument related to the claimant's RFC.  *Id.*  The Tenth Circuit noted that at the district court

level, the claimant had merely alleged, several times, that the ALJ had failed to consider the

objective medical evidence.  *Id.*  The appellate court cited to the opinion of the district court

judge, stating that "[b]ecause Claimant's counsel failed to present any developed argumentation

in regard to Claimant's physical impairments, the district court obviously viewed this issue as

waived."  *Id.*  The Tenth Circuit called the claimant's argument at the district court "perfunctory,"

and said that it had deprived that court of the opportunity to analyze and rule on that issue.  *Id.*

(quotation and citation omitted).  *See also Krauser v. Astrue*, 638 F.3d 1324, 1326 (10th Cir.

2011) (Tenth Circuit's review is limited to issues the claimant preserved at the district court level

and adequately presented on appeal); *Sullivan v. Colvin*, 2013 WL 950970 *1 (10th Cir.)

(affirming lower court's finding of waiver on credibility issue).

There is no issue raised by Newton that is developed sufficiently to allow the undersigned

to analyze and rule.  The Court has thoroughly reviewed Newton's Opening Brief, but the text is

disjointed and, in many instances, erroneous.  For example, a portion of the brief appears to

address the ALJ's Step Two decision.  Plaintiff's Opening Brief, Dkt. #18, pp. 6-7.  This

discussion of Step Two is nonsensical, because the ALJ found multiple impairments to be severe

at this step, and she continued the five-step process.  Newton does not identify any impairments

that the ALJ omitted at Step Two.  The inclusion of this section in Newton's brief is simply

inexplicable.

Under the heading of "Argument," Newton first appears to argue that the ALJ "dismissed"

Newton's claims of mental impairments.  Plaintiff's Opening Brief, Dkt. #16, pp. 7-8.  Newton

states that her activities of daily living do not equate to the ability to sustain work activity for a

typical work week.  *Id.*  This argument is not sufficiently developed to allow analysis, and it is

therefore waived.  *Wall*, 561 F.3d at 1066.  A review of the ALJ's decision, however, leads to the

conclusion that the ALJ thoroughly considered Newton's mental impairments.  She included

mental limitations in her RFC determination.  (R. 14-15).  She said that she relied on the opinion

evidence of Dr. Taber in the Mental Residual Functional Capacity Assessment and gave it "great

weight."  (R. 20-21).  Dr. Taber's reports are substantial evidence supporting the ALJ's RFC

determination.  *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining

consultant's opinion was an acceptable medical source which the ALJ was entitled to consider

and which supported his RFC determination); *Franklin v. Astrue*, 450 Fed. Appx. 782, 790 (10th

Cir. 2011) (unpublished) (RFC assessment of nonexamining consultant was part of substantial

evidence that supported the ALJ's findings); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th

Cir. 2009) (unpublished).

Next, Newton shifts to a discussion of the hypothetical questions the ALJ posed to the

vocational expert (the "VE").  Plaintiff's Opening Brief, Dkt. #16, pp. 8-11.  Newton includes an

extended discussion of the hypothetical questions, followed by a lengthy quote from the report of

examining consultant Dr. LaGrand.  *Id.*  This discussion does not appear to raise any issues,

although Newton makes a vague assertion that the jobs identified at Step Five "do not seem to

meet the requirement for lifting and carrying."  *Id.*, pp. 8-9.  This vague assertion is not a

developed argument that allows the Court to analyze and rule upon it, and any argument related to

this assertion is waived.  *Wall*, 561 F.3d at 1066.

Newton appears to argue that the RFC reflected in the first hypothetical to the VE is

inconsistent with the report of Dr. LaGrand and the treating evidence from DaySpring.  Plaintiff's

Opening Brief, dkt. #16, p. 11.  Again, this attempted argument is not adequately developed to allow the Court to rule, and it is therefore waived.  *Wall*, 561 F.3d at 1066.  Even in the absence of a finding of waiver, Newton's arguments would not be persuasive.

Newton makes a few statements regarding how treating physician opinion evidence is to be evaluated. Plaintiff's Opening Brief, Dkt. #16, pp. 11-12.  Newton has not identified any portion of the DaySpring records that constitute an "opinion" by a treating physician.  The Tenth Circuit in *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform."  Thus, the court found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion.  *Id.  See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations). Because Newton has not identified any portion of the records from DaySpring that she contends qualify as treating physician opinion evidence, her argument fails.

Newton then discusses some of the treating evidence.  Plaintiff's Opening Brief, Dkt. #16, pp. 12-13.  Apparently, she contends that the ALJ did not properly evaluate her mental impairments.  *Id.*, pp. 11-12.  Again, this argument is not sufficiently developed for meaningful review by this Court, and it is waived.  *Wall*, 561 F.3d at 1066.  Regardless of the finding of waiver, at most Newton is arguing that the ALJ should have given more weight to the evidence

favoring her application and less weight to unfavorable evidence.  The Court declines the invitation to reweigh the evidence.  *Newbold v. Colvin*, ___ F.3d ___, 2013 WL 2631530 *5 (10th Cir.).

Newton has identified no errors on the part of the ALJ, and a review of the ALJ's decision reveals that it is supported by substantial evidence.

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 5th day of August 2013.

Paul J. Cleary
United States Magistrate Judge